1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11

| | |
|---|---|
| PHL VARIABLE INSURANCE CO., | Case No. 10cv521 BTM(NLS) |
| Plaintiff, | **ORDER DENYING MOTIONS TO DISMISS** |
| v. | |
| HOWARD ABRAMS; MAYFAIR STRATEGIES, LLC; and THE ABRAMS FAMILY IRREVOCABLE LIFE INSURANCE TRUST, by and through its trustee, H. BRUCE ABBOTT, | |
| Defendants. | |

12
13
14
15
16
17
18
19
20
21
22

     The Abrams Family Irrevocable Life Insurance Trust ("Trust") and Mayfair Strategies, LLC ("Mayfair") (collectively "Defendants") have filed motions to dismiss Plaintiff's Second Amended Complaint ("SAC").  For the reasons discussed below, Defendants' motions to dismiss are **DENIED**.

23
24
25
26
27
28

## I.  BACKGROUND

     This action concerns a $10 million life insurance policy ("Policy") insuring the life of Howard Abrams.  The Policy was issued by PHL Variable Insurance Company ("Phoenix") to the Trust on March 15, 2008.

     Phoenix claims that Mayfair, Abrams, and the Trust made material representations to Phoenix during the application process regarding Abrams's net worth, Abrams's annual

income, the purpose for the policy, the payor of the premiums on the Policy, and whether there was any intention for a third party to obtain an interest in the Policy.  According to Phoenix, the Policy was not being purchased for estate planning purposes, as represented by Defendants, but, rather, was procured for the benefit of a third-party investor that lacked an insurable interest in Abrams's life.  Phoenix alleges that the Trust was established to act as a "straw-man" in a fraudulent STOLI (stranger originated life insurance) scheme.

Phoenix commenced this action on March 10, 2010.  Phoenix's First Amended Complaint ("FAC") asserted a single claim against the Trust for declaratory judgment that the Policy was null, void, and rescinded *ab initio* due to the fraudulent and/or material misrepresentations and omissions made on the application for the Policy.  The Trust brought a motion to dismiss the FAC, which the Court granted in an order filed on November 5, 2010. The Court ruled that Phoenix had not pled sufficient facts supporting its assertions that the Trust had misstated Abrams's net worth and annual income.  Although Phoenix had alleged that its own "independent investigation did not reveal any basis on which a person could reasonably conclude that Abrams had a net worth of $23,652,000 or annual earned income of $150,000 on the date of the application," Phoenix did not provide any details as to what the "independent investigation" entailed and what it uncovered.  The Court also ruled that the complaint lacked sufficient details supporting Phoenix's allegation that the Policy was procured as part of a fraudulent STOLI scheme to benefit a third-party investor.  Accordingly, the Court dismissed the FAC but granted Plaintiff leave to file a Second Amended Complaint ("SAC").

On November 23, 2010, Phoenix filed its SAC.  The SAC names as defendants Abrams, the Trust, and Mayfair.   The SAC asserts claims for (1) declaratory judgment - rescission due to material misrepresentation (against the Trust only); (2) declaratory judgment - rescission due to lack of insurable interest (against the Trust only); (3) fraud; (4) negligent misrepresentation; (5) civil conspiracy; and (6) breach of contract (as to Mayfair only).

1

2  **II.  STANDARD**

3      A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) should be granted

4  only where a plaintiff's complaint lacks a "cognizable legal theory" or sufficient facts to

5  support a cognizable legal theory.  Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th

6  Cir. 1988).  When reviewing a motion to dismiss, the allegations of material fact in plaintiff's

7  complaint are taken as true and construed in the light most favorable to the plaintiff.  See

8  Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995).  Although detailed

9  factual allegations are not required, factual allegations "must be enough to raise a right to

10  relief above the speculative level." Bell Atlantic v. Twombly, 550 U.S. 544, 127 S.Ct. 1955,

11  1965 (2007).   "A plaintiff's obligation to prove the 'grounds' of his 'entitle[ment] to relief'

12  requires more than labels and conclusions, and a formulaic recitation of the elements of a

13  cause of action will not do."  Id.  "[W]here the well-pleaded facts do not permit the court to

14  infer more than the mere possibility of misconduct, the complaint has alleged - but it has not

15  show[n] that the pleader is entitled to relief." Ashcroft v. Iqbal, __ U.S. __, 129 S,Ct. 1937,

16  1950 (2009) (internal quotation marks omitted).

17  **III.  DISCUSSION**

18      The Trust and Mayfair move to dismiss the SAC for failure to state a claim and failure

19  to comply with the heightened pleading requirements of Fed. R. Civ. P. 9(b).  As discussed

20  below, the Court concludes that the allegations of the SAC are sufficient to survive a motion

21  to dismiss.

22

23  A.  Fraud-based Claims

24      Defendants argue that Phoenix's fraud-based claims (Counts I-IV) fail because

25  Phoenix has failed to plead fraud with the requisite specificity.  Defendants further argue that

26  Phoenix has failed to comply with the Court's November 5, 2010 Order, which explained that

27  the SAC should establish that Phoenix discovered facts that would justify rescission prior to

28  the expiration of the two-year contestability period.  The Court does not find these arguments

1   persuasive.

2       A court may dismiss a claim of fraud when its allegations fail to satisfy Rule 9(b) 's

3   heightened pleading requirements. <u>Vess v. Ciba-Geigy Corp. U.S.A.</u>, 317 F.3d 1097, 1107

4   (9th Cir. 2003).  Averments of fraud must be accompanied by the "who, what, when, where,

5   and how" of the misconduct charged.  <u>Cooper v. Pickett</u>, 137 F.3d 616, 627 (9th Cir. 1997).

6       The Court believes that Phoenix has satisfied Rule 9(b)'s pleading requirements.  In

7   its November 5, 2010 Order, the Court dismissed Phoenix's declaratory judgment claim

8   because Phoenix had failed to provide any details regarding its "independent investigation"

9   or any facts supporting its conclusion that the Policy was purchased in furtherance of a

10  fraudulent STOLI scheme.  In the SAC, Phoenix clarifies that it discovered the following

11  information as part of its own investigation: (1) Abrams filed for Chapter 7 bankruptcy

12  protection in 1995; (2) Abrams has had seven different creditors turn over accounts to

13  collection agencies, and four credit accounts charged off between September 2001 and April

14  2006; (3) a $3,387.78 judgment was taken against Abrams by Barnes Financial Services in

15  November of 2003; (4) Abrams's landlord filed suit to evict him from a rental house in April

16  of 2009; (5) a Dun and Bradstreet Report on Modular Concepts indicates that the company

17  employs only two people and generates estimated annual revenues of on $170,000; (6)

18  Modular Concepts' corporate charter was revoked by the Nevada Secretary of State in

19  November of 2009 after it failed to file its annual corporate statement and pay its annual fees;

20  and (7) Abrams was not identified as a corporate officer in any of the annual corporate

21  statements filed by Modular Concepts with the Nevada Secretary of State between October

22  of 2003 and April of 2009.  (SAC ¶ 36.)

23      The Trust complains that Phoenix does not set forth the date of the investigation and

24  has not established that the investigation took place prior to the expiration of the

25  contestability period.  However, the Court interprets the SAC as adding detail regarding the

26  independent investigation referenced in the original complaint and the FAC.   In its

27  Opposition, Phoenix confirms that the "independent investigation" described in the SAC was

28  conducted prior to filing the original complaint.  The Court does not find it necessary for

1    Phoenix to amend the complaint once again to allege specific dates of the investigation.

2         Phoenix has alleged sufficient facts in support of its claim that the Trust and Mayfair

3    made fraudulent misrepresentations regarding Abrams's net worth and annual earned

4    income.   In the Application, the Trust represented that Abrams had a net worth of

5    $23,652,000 and an annual earned income of $150,000. (SAC ¶ 27.) Mayfair also submitted

6    a Producer's Report, which represented that Abrams's net worth was $23,652,000 and his

7    annual earned income was $150,000.  (SAC ¶ 29.)  Abrams represented to an inspector for

8    Profile Services, Inc. (a third-party vendor who prepared an inspection report for Phoenix)

9    that his annual income was approximately $175,000 and was derived from business

10   consulting and his job as a corporate secretary for Modular Concepts, Inc. ("Modular

11   Concepts").  (SAC ¶ 32.)  Abrams also represented that he owned over $20 million in

12   Modular Concepts stock. (Id.)  Phoenix received a financial statement prepared by Abrams

13   which represented that Abrams's assets consisted of $25,000 in cash, $20,800,000 in

14   Modular Concepts stock, $2,500,000 in stock in closely held corporations, $200,000 in

15   partnership interests, and $150,000 in personal property.  (SAC, ¶ 33.)

16        The facts uncovered by Phoenix during its independent investigation support the

17   conclusion that the representations regarding Abrams's net worth and annual earned income

18   were false.   The results of the investigation indicate that Abrams had ongoing financial

19   troubles.  In addition, it appears that the value of the Modular Concepts stock and the amount

20   of Abrams's salary as secretary for the company (if indeed he was the secretary) was greatly

21   exaggerated.  If, as indicated on the Dun and Bradstreet Report, Modular Concepts employs

22   only two people and generates estimated annual revenues of only $170,000, it seems

23   unlikely that Abrams held $20,800,000 in Modular Concepts stock and also drew a

24   substantial salary as secretary for the company.

25        Phoenix alleges that Mayfair and the Trust knew that Abrams did not have a net worth

26   of $23,652,000 and an annual income of $150,000 at the time they executed the Application

27   and Producer's Report, respectively.  (FAC ¶ 37.)  The knowledge and intent of Defendants

28   may be averred generally.  Fed. R. Civ. P. 9(b).  Thus, Phoenix has alleged with sufficient

10cv521 BTM(NLS)

1  particularity that the Trust and Mayfair made fraudulent representations regarding Abrams'

2  net worth and annual earned income.

3      The Court also concludes that Phoenix has alleged sufficient facts in support of its

4  claim that Defendants made fraudulent representations regarding the purpose of the Trust

5  – i.e., Defendants represented that the Policy was for estate planning needs and that there

6  was no intention that any third party would obtain any rights or interest in the Policy even

7  though the Policy was actually being purchased in connection with an agreement with a third-

8  party investor that the beneficial interest in the Policy would ultimately be transferred to that

9  third party.  Although  the existence of the agreement or understanding with the third-party

10 investor is stated "upon information and belief," Phoenix has alleged facts in support of its

11 "information and belief."  See Zatkin v. Primuth, 551 F. Supp. 39, 42 (S.D. Cal. 1982)

12 (explaining that where plaintiffs cannot be expected to have personal knowledge of the facts

13 constituting wrongdoing, a complaint "based on information and belief is sufficient if it

14 includes a statement of the facts upon which the belief is based.")  According to the SAC, the

15 Trust applied for a very large life insurance policy and made misrepresentations regarding

16 Abrams's net worth and annual earned income to obtain the Policy.  Furthermore, given the

17 results of Phoenix's investigation, serious questions are raised as to whether Abrams was

18 financially capable of paying the initial $385,000 annual premium payment on the Policy.

19 Based on these facts, Phoenix has a plausible claim that the Trust was established to act as

20 a straw-man in a fraudulent STOLI scheme.  The factual circumstances of the alleged fraud

21 have been alleged with particularity.

22     The Trust argues that Phoenix is required to allege the identity of the third party

23 investor.   The Trust cites to Sun Life Assurance Co. of Canada v. Berck, 719 F. Supp. 2d

24 410 (D. Del. 2010), where the court held that a plaintiff alleging the existence of a STOLI

25 arrangement must allege the identity of the stranger third party.  The Court declines to follow

26 Berck.  It is sufficient for pleading purposes that Phoenix alleged that at the time of the

27 Policy's inception, there was an agreement with a specific third party (whose identity is not

28 yet known) that the beneficial interest in the Policy would be transferred to the third party.

1    Defendants' motions to dismiss Phoenix's fraud-based claims for failure to plead fraud

2    with the requisite specificity are denied.

3

4    B.  Insurable Interest

5    The Trust argues that Count II of the SAC (declaratory judgment - rescission due to

6    lack of insurable interest) fails because Phoenix has not alleged an insurable interest

7    violation.  According to the Trust, an irrevocable trust has an insurable interest in the life of

8    its settlor, and, therefore, insurable interest is not lacking here.

9    The Court agrees that an irrevocable trust normally has an insurable interest in the

10   life of its settlor.  However, if the trust is merely acting as a "straw man" to carry out a STOLI

11   scheme, that is a different matter.

12   Under California law, an insured must have an "insurable interest" in order for a life

13   insurance contract to be valid.  Cal. Ins. Code § 280.  An insurable interest is defined as:

14       [A]n interest based upon a reasonable expectation of pecuniary advantage
         through the continued life, health, or bodily safety of another person and
15       consequent loss by reason of that person's death or disability or a substantial
         interest engendered by love and affection in the case of individuals closely
16       related by blood or law.

17   Cal. Ins. Code § 10110.1(a).  Under Cal. Ins. Code § 10110.1(e), "[a]ny device, scheme, or

18   artifice designed to give the appearance of an insurable interest where there is no legitimate

19   insurable interest violates the insurable interest laws."  Accordingly, "any arrangement by

20   which a life insurance policy is initiated for the benefit of a 'third party investor' who has no

21   insurable interest in the insured's life at the time the policy is issued is deemed a STOLI,

22   which is a prohibited 'fraudulent life settlement act.'"  Ohio Nat'l Life Assurance Corp. v.

23   Davis, 2010 WL 4916643, at * 4 (C.D. Cal. Dec. 1, 2010).[1]

24   As discussed above, Phoenix has sufficiently alleged the existence of a STOLI

25   _____

26       [1] It appears that under the Utah law in effect at the time the Policy was issued, the
     lack of insurable interest would not render an insurance policy invalid.  See Utah Code Ann.
27   § 31A-21-104(5)(a) (2007).  The current statute also provides that an insurance policy is not
     invalid if issued to a person who lacks an insurable interest.  Utah Code Ann. § 31A-21-104
28   (6)(a)(i).  Both the Trust and Phoenix refer to California and Utah law, but neither engages
     in a choice-of-law analysis.  If Defendants believe that Utah law applies and disposes of one
     or more claims, Defendants may bring a motion for judgment on the pleadings.

10cv521 BTM(NLS)

1   scheme whereby the Policy was procured for the benefit of a third-party investor.

2   Accordingly, Phoenix has alleged an insurable interest violation under California law.

3

4   C.  Incontestability Clause

5       The Trust contends that Count III (fraud) and Count IV (negligent misrepresentation)

6   are barred by the Policy's incontestability clause.  The Court disagrees.

7       Under Cal. Ins. Code § 10113.5, "An individual life insurance policy delivered or issued

8   for delivery in this state shall contain a provision that it is incontestable after it has been in

9   force, during the lifetime of the insured, for a period of not more than two years after its date

10  of issue . . . ."  The Policy includes an incontestability clause, which provides: "This policy

11  shall be incontestable after it has been in force during the Insured's lifetime for two years

12  from the issue Date, except for fraud, or any provision for reinstatement or policy change

13  requiring evidence of insurability."  (Policy, Section 21.)

14      Under California law, incontestability clauses in life insurance policies "bar the insurer

15  from rescinding or otherwise invalidating the policy after the contestable period has expired,

16  even in the face of gross fraud in procuring the policy."  United Fidelity Life Ins. Co. v. Emert,

17  49 Cal. App. 4th 941. 944 (1996).   As explained by the California Supreme Court:

18          When an insurance policy by its provisions is made incontestable after a
            specified period, the intent of the parties is to fix a limited time within which the
19          insurer must discover and assert any grounds it might have to justify a
            rescission of the contract. Accordingly, the insurer must make its 'contest of the
20          policy" within the prescribed period, either by the institution of a suit to cancel
            the policy or by setting up misrepresentation or fraud in the procurement of the
21          policy as a defense in an action brought by the insured or the beneficiary.

22  New York Life Ins. Co. v. Hollender, 38 Cal. 2d 73, 78 (1951).

23      The Trust argues that Counts III and IV are barred because they were not asserted

24  in the original complaint and were first raised after the two-year period.  However, this lawsuit

25  was instituted prior to the expiration of the two-year period, and the original complaint, which

26  contested the Policy, was based on the same facts – i.e., fraudulent misrepresentations

27  regarding Abrams's net worth, Abrams's annual income, and the purpose of the Policy.  The

28  new fraud and negligent misrepresentation claims are just alternate legal theories based on

8

1   the same facts *discovered and raised during the contestability period.*  Allowing Phoenix to

2   refine its complaint to assert alternate legal theories does not undermine the purpose of the

3   incontestability clause.

4

5   D.  Civil Conspiracy

6          Defendants seeks to dismiss Phoenix's civil conspiracy claim on the ground that it is

7   not an independent cause of action.  "Conspiracy is not a cause of action, but a legal doctrine

8   that imposes liability on persons who, although not actually committing a tort themselves,

9   share with the immediate tortfeasors a common plan or design in its perpetration." Applied

10  Equipment Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 510-511 (1994). Phoenix's civil

11  conspiracy claim is based on the fraud and negligent misrepresentation claims, which have

12  survived Defendants' motions to dismiss.  Although civil conspiracy may not technically be

13  an independent cause of action, the Court will allow it to stand in conjunction with the tort

14  claims.

15

16  E.  Retention of Premiums Paid for a Rescinded Policy

17         The Trust seeks dismissal of Phoenix's request for a declaratory judgment that

18  Phoenix should be permitted to retain all or part of the Premiums paid for the Policy in the

19  event of rescission.  (SAC ¶¶ 51-57.)[2]  The Trust contends that upon rescission, Phoenix is

20  required to return all of the premiums paid and cannot retain any part of the premiums as an

21  offset against consequential damages suffered by Phoenix.

22         In PHL Variable Ins. Co. v. Clifton Wright Family Ins. Trust, 2010 WL 1445186 (S.D.

23  Cal. Apr. 12, 2010), this Court addressed this very same argument.  Based upon Cal. Civ.

24  Code § 1692 and California case law, the Court held that Phoenix's request to keep

25  premiums  to cover its consequential damages was not barred.  The Court explained that

26  Cal. Ins. Code § 481, which merely restates the rule that a rescinding party must restore to

27  _____

28         [2]  Technically, the Trust should have brought a motion to strike these allegations.
    However, the form of the motion does not matter given the Court's rejection of the Trust's
    position.

1  the other party everything of value which he has received under the contract, does not

2  preclude a setoff for consequential damages under Cal. Civ. Code § 1692.

3      Referring to Clifton Wright, the Trust states: "[A] federal court misinterpreted California

4  law and incorrectly held that a life insurer may seek to retain premiums received in a

5  rescission action as a setoff for alleged consequential damages under Cal. Civ. Code § 1692.

6  That court was clearly wrong . . . ."  *That* court was *this* Court (i.e., Judge Moskowitz), and

7  this Court stands by its reasoning in Clifton Wright.  The Court also points out that in a recent

8  case, the Central District followed Clifton Wright.  See Hartford Life & Annuity Ins. Co. v.

9  Doris Barnes Family 2008 Irrevocable Trust, 2011 WL 759554, at *4-5 (C.D. Cal. Feb. 22,

10  2011).

11

12  F.  Breach of Contract

13      In Count VI, Phoenix alleges that Mayfair breached the Broker Agreement (1) by

14  participating in a practice or plan to initiate a life insurance policy for the ultimate benefit of

15  a third party who has no insurable interest in Abrams; and (2) by placing an unsuitable policy

16  with Phoenix.  (SAC ¶ 76.)

17      Mayfair has submitted an unexecuted copy of a Broker Agreement, which Mayfair

18  believes is the Broker Agreement to which Phoenix is referring in the SAC.  (Mayfair Ex. 1.)

19   Section 2.13 provides: "Broker shall not directly or indirectly participate in a practice or plan

20  to initiate a life insurance policy for the ultimate benefit of a third party who, at the time the

21  life insurance policy is originated, has no insurable interest in the insured, the insured's

22  consent to or knowledge of the insurance coverage notwithstanding."  Mayfair argues that

23  Phoenix has not alleged sufficient facts that the Policy was procured for the benefit of a third

24  party who did not have an insurable interest in Abrams.  However, the Court has held that

25  Phoenix has satisfied the pleading requirements in this regard.

26      As for Phoenix's allegation that Mayfair breached the contract by placing an unsuitable

27  policy with Phoenix, Mayfair argues that the "suitability" clause of the contract concerns the

28  suitability of the policy for the insured and the purchaser of the policy.  Section 2.4 of the

10cv521 BTM(NLS)

1   Broker Agreement states:  "Broker shall insure that each sale of Phoenix Products covered

2   by this Agreement which is proposed or made directly by the Broker is appropriate for and

3   suitable to the needs of the insured and the person or entity to whom Broker made the sale,

4   at the time the sale is made, and suitable in accordance with Applicable Law governing

5   suitability of insurance products."  The Court agrees that this clause discusses suitability for

6   the insured/purchaser, not Phoenix.

7        However, it is possible that Mayfair's alleged conduct breached other provisions of the

8   contract besides the "Insurable Interest" provision.  For example, Mayfair agreed to "comply

9   with all marketing and underwriting guidelines of Phoenix applicable to the Phoenix

10  Products."  (Section 2.6.)  Mayfair also agreed to "comply with all Applicable Laws and

11  policies and procedures established by Phoenix."  (Section 2.10.)

12       For these reasons, Mayfair's motion to dismiss the contract claim is denied.

13

14                          **IV.  CONCLUSION**

15       For the reasons discussed above, the motions to dismiss filed by the Trust and

16  Mayfair are **DENIED**.  Defendants shall file an answer to the SAC within 20 days of the entry

17  of this Order.

18  **IT IS SO ORDERED.**

19

20  DATED:  January 3, 2012

21

22                          Honorable Barry Ted Moskowitz
                            United States District Judge

23

24

25

26

27

28

11                                                            10cv521 BTM(NLS)